# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DAMION A. WILSON,            *

Petitioner.                   *

v                           *       Civil Action No. PX-16-3813

WARDEN RICHARD MILLER,    *
THE ATTORNEY GENERAL FOR
THE STATE OF MARYLAND,    *

Respondents.              *
                             ***

## <u>MEMORANDUM OPINION</u>

Pending before the Court is Damion Wilson's Petition for Habeas Corpus brought pursuant to 28 U.S.C. § 2254. Wilson challenges the validity of his conviction for second degree murder entered pursuant to his *Alford*[1] plea. In compliance with this Court's Memorandum Opinion and Order directing a Supplemental Response to Petitioner Damion Wilson's Petition for Writ of Habeas Corpus, Respondents have renewed their Response and filed exhibits not initially submitted. ECF No. 17. Wilson has also replied. ECF No. 19. The Court finds a hearing unnecessary. *See* Loc. R. 105.6; *see also* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts*; *Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. § 2254(e)(2)). For the following reasons, the petition is dismissed.

---

[1] *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) (defendant may waive trial and be found guilty without admitting criminal conduct).

## I. Background

### A. *Alford* plea proceedings

On September 21, 2000, Petitioner Damion Wilson entered an *Alford* plea to one count of second-degree murder in the Circuit Court for Charles County, Maryland. ECF No. 17-1 at 12–17 (transcript of *Alford* plea). Wilson had been charged with first degree murder, first degree assault and handgun offenses in connection with the shooting death of Gale Cooke and threats to kill his then-girlfriend, Gale's daughter, Katrina Cooke. If Wilson went to trial and was found guilty of first degree murder, the State's Attorney intended to pursue a sentence of life without the possibility of parole. Wilson thus entered an *Alford* plea to the lesser charge of second degree murder in exchange for the State dropping all other charges. *Id*. at 2.

At the plea hearing, the State proffered the following evidence that would have been proven beyond a reasonable doubt at trial:

> THE STATE: Your Honor on the 25th of January of the year 2000, Gale Ann Cooke lived in La Plata in Charles County, Maryland. That evening, about 11:20, Jaqueline Stancliff, her next door neighbor would testify that she heard a single shot and called the police. They live in a townhouse development and their townhouses are next to each other.
>
> Miss Stancliff would also testify that shortly after she heard the gun, the single gunshot, she then saw a figure running across the backyard. She would characterize that figure as slight or of teenage in build.
>
> She would also testify that night it had—there had been a lot of snow during the day, and that there was a heavy snowfall on the ground.
>
> Although it was not snowing, the snow had stopped by 11:20 that night.
>
> A corporal Bacon of the Charles County Sheriff's office would testify that he's a K-9 officer. He took his K-9 and tracked from the area indicated by Miss Stancliff, a trail, that led from that area towards the Old Colony Apartment Complex which is about a three-minute walk away, and is also the complex in which the defendant's mother lives.

Emergency personnel arrived to the scene. And when the emergency personnel employees arrived on the scene of Gale Cook[e]'s residence, they found Mrs. Cook[e] on the floor by the foyer with wounds that were later determined by the medical examiner to be caused by a single shot that went through her right arm, into her chest, through her heart, and exiting on the left side. And the medical examiner would say that that was the cause of death.

One of the residents of Mrs. Cook[e]'s home was her daughter Katrina Cook[e] who was home that night when the police arrived and Jaqueline Stancliff would testify that Katrina Cook[e] came over to her house and asked to use the telephone. And, in fact, Katrina Cook[e] did call the police, placing a 911 call, reporting the shooting.

Katrina Cook[e] would testify that she had to go to Miss Stancliff's home to make the call because there was no phone in their residence.

Katrina Cook[e] would testify that the defendant came by the townhome, the residence, about or shortly after 11:00 that night. She went outside and spoke with him. She knows him. He is the father of her youngest child. They spoke outside.

And that while he was out speaking with her, she was drinking orange juice and alcohol out of an orange juice bottle. Later, when the snow melted, the police would report they recovered an orange juice bottle from the area, the front yard of the townhouse.

Miss Katrina Cook[e] would testify that during the course of their conversation outside, there came a point in time where the lights on the front porch flashed. She took that to be a sign from her mother that it was time for her to come inside.

She came inside. And she came inside. The defendant also went inside with her. She would verify that there was a conversation, a three-way conversation between her mother, the defendant, and Katrina Cook[e]. And that in that conversation Miss Cook[e] advised the defendant that he wasn't supposed to be there, and that he should leave.

Words were exchanged among the three. There came a point in time whether [sic] the defendant left the house, door shut. He apparently thought the better of it, opened the door and came back in. Everyone was still there at the front of the house. He had a handgun. Took the handgun and pointed the handgun at both Mrs. Cook[e] and her daughter, Katrina, threatening both of them.

There came a point in time where during the course of threatening them, he pointed the gun and fired it. It was – all three were standing in the foyer area. It is a very – it is a small townhouse. The [foyer] area is quite small. Miss

3

Cook[e] was – she would testify that when the shot rang out her mother fell to the floor.

Miss Cook[e], Katrina Cook[e], would testify that the defendant then pointed the gun at her telling her that since she had just witnessed her mother being killed that she was witnessing he would have to kill her as well. They had a discussion in which she begged him not to kill her.

She would testify that eventually he relented after she assured him that she would not report him to the police.

She would testify that he then fled the apartment with a handgun running out the front and going in a direction past Miss Stancliff's. She then went over and made the 911 call at Miss Stancliff's.

Bernard Patrick Cole, Junior, would testify that he knows the defendant and that he was walking through the townhouse development that evening about a quarter after 11. And that at that time he saw Katrina Cook[e] in front, and that he knows Katrina Cook[e]. He saw Katrina Cook[e] in front of her mom's townhouse and that Katrina Cook[e] was talking to someone who he recognized as fitting the physical appearance of the defendant. He did not have any conversation with them. He continued on his way.

Jessica Powell would testify that she saw the defendant earlier in the day. And that when she saw the defendant he was drinking alcohol and OJ, orange juice, and that he appeared to be intoxicated to her, and that he brandished a semiautomatic handgun and said words to the effect that, I am going to kill that bitch, not specifying any particular individual, but that she saw the handgun and that she heard him say those words.

Another individual also saw him that evening with a handgun.

The coroner would testify that Gale Cook[e] died as a result of the single shot that went through her right arm into her chest cavity piercing her heart, and then exiting the other side.

This all happened in Charles County. That would be some of the evidence that the State could present.

ECF No. 17-1 at 12–17.

Wilson withdrew his plea of not guilty and his plea of not criminally responsible (NCR), and acknowledged that the state possessed sufficient evidence to demonstrate beyond a reasonable doubt Wilson's guilt to second degree murder. *Id*. at 6. At the time of the hearing, Wilson was

17-years old and had a ninth-grade education. *Id*. In response to questions from the presiding judge regarding his mental status, Wilson indicated that he suffered from stress and depression, for which he was under a doctor's care, and that he had not taken the medication prescribed for his condition on the day of sentencing. *Id*. at 8–9.

Wilson's attorneys and the prosecutor confirmed that Wilson had been deemed competent after evaluation. *Id.* at 4. The Court also fully reviewed with Wilson his constitutional trial rights and secured that Wilson understood that he was waiving the same. *Id.* at 9–12. Defense counsel also confirmed receipt of discovery supporting the proffer. *Id*. at 17. The trial court found that Wilson's plea was knowing and voluntary, and that he understood the nature of the charges and the rights that he was giving up by entering an *Alford* plea. *Id*. at 18. The Court imposed the agreed upon sentence of 30 years imprisonment. *Id*. at 31.

### B.     Post-Conviction Proceedings

Wilson, in a post-conviction petition, moved to set aside his conviction, arguing that his trial counsel provided constitutionally ineffective assistance and that the State withheld exculpatory evidence. The Circuit Court for Charles County held a two-day evidentiary hearing on the petition. *See* ECF Nos. 17-2, 17-3.

At the hearing, Wilson testified that prior to the plea, he was unaware that Katrina Cooke's three-year-old daughter, Alura Brown, had pointed to a torn, black-and-white photograph of her father, Sean Brown, when asked by a police officer on the night of the shooting to identify who she had seen in the house when her grandmother "fell." ECF No. 17-2 at 24–26. Wilson claimed he only became aware of this evidence after receiving a response to his request under the Maryland's Public Information Act. *Id*. at 24. Wilson also testified that trial counsel, Betty Stilt and Elizabeth Cawood, began talking to him about taking a plea one-month after his arrest and

never advised him they had received a tape-recorded message from Katrina Cooke establishing his innocence. *Id*. at 17, 20. He described the discovery documents he had been provided by trial counsel as about fifty pages that did not include Medical Examiner's autopsy report. *Id*. at 21–22. Wilson testified this report would have influenced his decision to enter an *Alford* plea because, contrary to the State's representations, the autopsy report concluded that the shooting was not at "close range." *Id*. at 23.

Wilson explained that he took the plea because his trial counsel "advised me of false evidence concerning my case and I believed what they was telling me because I didn't see the, any reports concerning the evidence, really, but I was just going off what they was telling me." *Id*. at 27. He also claimed that counsel told him he would only have to serve 12 years on the sentence imposed. *Id*. At the time of the post-conviction hearing, Wilson had served 13 years and 10 months. *Id*. at 27–28.

Additionally, Wilson testified that he had learned the "footprints" that the police had followed the night of the murder were from the front of the house, and not the same path of the person who Stancliff had seen running. *Id*. at 32. Wilson also testified to having learned that Bernard Cole's identification of Wilson was based on Cole's assumption that the man Cole saw with Katrina Cooke was Wilson because Wilson and Cooke were dating. *Id*. at 34; ECF No. 17-3 at 111. Wilson also testified that he had informed the trial judge in writing that he had wished to plead not guilty, that he had not received certain evidence such as fingerprint reports, and that he had not been present when the attorneys entered an NCR plea on his behalf. ECF No. 17-2 at 37–39.

At the hearing, Wilson also offered the expert testimony of Gerald Styers, a firearms and tool mark examiner, who testified that based on his review of multiple investigative reports,

firearms examination reports, the autopsy report, and photographs of the crime scene, Katrina Cooke's description of the shooting was physically impossible. ECF No. 17-2 at 97–101. Styers particularly opined that a live cartridge found in a boot behind the front door at the time of the shooting, which would have been ejected when the shooter double-cocked the weapon, placed the shooter inside the home, not at the exterior doorway as Katrina Cooke described. *Id*. at 101–02. However, on cross-examination, Styers admitted that Katrina Cooke also told police Wilson had walked around the foyer after he shot Gale Cooke and kicked the body, thus presenting an opportunity for the live cartridge to have fallen into the boot at a time other than the shooting itself. *Id*. at 114. Critically, Styers also admitted that the location of a spent shell casing recovered from the scene placed the shooter at the front door at the time of the shooting, consistent with Cooke's eyewitness account. *Id.* at 118–19.

Wilson also called Stancliff, the next-door neighbor, who testified that she had contacted 911 after she heard a shot fired from inside the adjoining townhome. ECF No. 17-3 at 11, 16. After hearing the shot, Stancliff looked out of an upstairs window and saw a young male with a slight build wearing jeans and running down the sidewalk toward a wooded area between her neighborhood toward The Meadows, where Wilson lived with this mother. *Id*. at 13, 17.

Two additional witnesses, Erica and Carolyn Farmer, testified regarding the statements they had given to police about having seen Wilson the night of the shooting at the Dash-in convenience store, brandishing a gun and making statements that he was going to kill someone. ECF No. 17-3 at 19–21 (testimony of Erica Farmer); *id.* at 27–28 (testimony of Carolyn Farmer). Of particular note, Carolyn Farmer testified that she did not specifically remember giving a statement to the police because "it's been so long." *Id*. at 33–34. Yet she remembered going to

work late the night of the murder because she played Bingo earlier that evening and it was a Thursday night. *Id*. at 37–38. In fact, the night of the murder, January 25, 2000, was a Tuesday.[2]

Captain Dan Gimler, the first police officer on the scene, also testified that he had moved a wooden bench to cover the area in the hallway where he found the spent shell casing so that the casing would not be disturbed pending the arrival of homicide detectives. Gimler also admitted to moving boots and other items from behind the front door to allow emergency responders easier access to the victim. ECF No. 17-3 at 42–45. Gimler also described finding three-year-old Alura upstairs. Alura told Gimler that someone else was in the house when "Grandma fell." *Id*. at 49. When asked who the person was, Alura pointed to a torn picture of a young black man, Sean Brown, her father. *Id*. at 49–50. Gimler stated that he left the picture on the shelf and noted the interaction with Alura in his report. *Id*. at 50–51. On cross-examination, Gimler confirmed that Alura never told Gimler that her father had been in the house that evening. *Id*. at 59.

Wilson's prior defense attorneys, Betty Stilt and Elizabeth Cawood, also testified at the hearing. Cawood had been lead trial counsel and Stilt was more involved with investigating, filing motions, and negotiating with the State's Attorney. ECF No. 17-3 at 65 (direct testimony, Betty Stilt). Both attorneys recalled that Ms. Stilt had a better relationship with the State's Attorney assigned to the case and that was the impetus for her taking the lead on negotiations. *Id*. at 67, 189. Ms. Cawood testified as to having been involved in a discovery dispute with the State's Attorney early in the case about whether the State should disclose Katrina Cooke's whereabouts. *Id*. at 194–95 (direct testimony, Elizabeth Cawood). The dispute was settled after Cawood filed a

---

[2] *See* https://www.timeanddate.com/calendar/ (last visited March 15, 2019).

motion to compel, which was granted with the provision that Katrina Cooke's location would not be disclosed to anyone else. *Id.* at 195.

Betty Stilt testified that she visited Wilson often because she was concerned about his welfare. Wilson, a juvenile at the time, had been segregated from the adult detention population. Stilt described Wilson as mature and intelligent and that he had "dissected" every angle of his case, taking "copious notes" on the evidence that the State was planning to use against him. ECF No. 17-3 at 70–71, 87. Stilt recalled that the first two plea offers included life imprisonment. *Id.* at 69. Stilt took back to the State Wilson's suggested 25-year sentence, and the State countered with 30 years which became the agreed-upon recommendation.[3] *Id.* at 86, 134. Stilt also testified that she and Cawood remained willing to go to trial if Wilson rejected the plea and noted that, while she viewed the evidence as strong, she also believed Katrina Cooke's credibility was shaky. *Id.* at 127–28. Ultimately, Stilt testified, Wilson decided to take the plea because he did not want to risk receiving a life sentence after trial. *Id.* at 88, 123.

Stilt also confirmed that Wilson knew specifically about the evidence in advance of his trial that he now claimed in his post-conviction hearing had been withheld. Stilt testified that Wilson had memorialized his review of this evidence in handwritten notes which he sent to Stilt in advance of trial. *Id.* at 109–111. These notes reflect that Wilson knew about the torn photograph of Sean Brown, the content of the Medical Examiner's report, Bernard Cole's statement, and a recorded phone message from Katrina Cooke.[4] ECF No. 17-3 at 107–58.

---

[3] Wilson's willingness to serve 25 years for the crime was confirmed by a letter he wrote to Bernard Cole while incarcerated. *See* ECF No. 17-4 at 20.

[4] The attorney who had represented Wilson in juvenile cases testified that Katrina Cooke had left a voicemail weeks after her mother's murder to inform him that Wilson had been arrested on a violation of probation charge in connection with a juvenile court proceeding. He characterized the tone of Ms. Cooke's voice as very concerned about Wilson. ECF No. 17-3 at 279–84. Wilson knew that Cooke had "called my lawyer and left a message on his answering machine leting [sic] him know that I had been locked up," in advance of his taking the *Alford* plea. ECF No. 17-4 at 18 (post-conviction court quoting Wilson's letter).

Stilt and Cawood also testified that had Wilson chosen to go to trial, they would have advanced the theory that Katrina Cooke killed her mother and Wilson was elsewhere. ECF No. 17-3 at 145, 158, 208–0f9. The attorneys also candidly admitted that the defense was risky and could have resulted in a sentence much longer than 30 years. *Id*. at 83, 86, 88, 190. Both attorneys had communicated the salient risks and benefits to Wilson as to trial but exerted no pressure on him to take the plea. *Id*. at 81, 191.

In an opinion dated July 14, 2014, the post-conviction court denied relief on all claims except the claim regarding restitution. *See* ECF No. 17-4. Specifically, the Court found Wilson had received *Brady* material in advance of trial, including Alura's identification of another man as present at the scene. ECF No. 17-4 at 4–5. The Court further noted that Wilson's own contemporaneous notes confirms his timely receipt of this evidence in advance of his plea. *Id.* at 5–6.

Similarly, the Court found that the now proffered ballistics expert, who suggested that the shooter was not standing where Katrina Cooke had reported, was not exculpatory. *Id*. at 14–15. The evidence was, at best, one of "a number of methods available to impeach" Katrina Cooke. *Id*. at 14. As to the autopsy report, the court was similarly not moved, finding that the report was not withheld and, even if it had been, "evidence of close range shooting can be obscured by factors such as clothing on the victim." *Id*. at 15.

With regard to Wilson's ineffectiveness claim, the post-conviction court found that the attorneys performed satisfactorily. The Court noted that Wilson's claimed failure of counsel to investigate the source of fingerprints located at the scene was rather good lawyering. "[I]t was reasonable for Counsel not to investigate the source of those prints;" where the state bears the

burden of proof "[m]issing information can be helpful to the defense because it creates doubt in the minds of jurors," and "investigating too much can eliminate that doubt." *Id.* at 13.

As to defense counsel's failure to investigate Katrina Cooke as the real perpetrator, the Court found that Wilson's letters to counsel demonstrated Wilson and counsel actively considered this theory. "Clearly Petitioner and his Counsel were well aware of the sour relationship between decedent and her daughter," yet, "Petitioner still elected to plead guilty." *Id.* at 16. As to Wilson's assertion that trial counsel should have objected to the State's mischaracterization of Bernard Cole's statement to police, the Court found that it was not "a major mischaracterization" since "Mr. Cole would not have believed the individual was [Wilson] if the individual did not look like [Wilson]." *Id.* at 18. The post-conviction court also reasoned that "even if Counsel objected and the State's Attorney corrected his statement to say 'Bernard Cole would testify that he saw an individual that he believed to be Damion Wilson talking with Katrina,' the trial judge still would have found a factual basis for the plea. Therefore, Petitioner was not prejudiced by Counsel's failure to object to any misstatement in the factual proffer for the plea." *Id.* at 19. Ultimately, the Court concluded that "[t]he overwhelming weight of the evidence demonstrated that [Wilson] was a young man who did not want to risk the possibility of being sentenced to life without parole. . . . Therefore, he accepted the plea as the lesser of two options." *Id.* at 20.

### C.    Procedural History

Wilson's *Alford* plea proceedings took place on September 21, 2000. ECF No. 5-1 at 18 (state docket entry 70000). He was sentenced to serve 30 years of imprisonment on December 8, 2000; he did not appeal the plea proceedings and the time for doing so expired on January 8, 2001. *See* Md. Rule 8-204 (application for leave to appeal must be filed within 30 days after entry of

judgment or order challenged). For purposes of seeking federal habeas relief under 28 U.S.C. § 2254, Wilson's conviction became final on January 8, 2001.

On April 17, 2003, Wilson moved for reconsideration of his 30-year imprisonment sentence. ECF No. 5-1 at 20 (state docket entry 91000). The motion was denied on June 2, 2003. *Id*. (state docket entry 93000).

On March 30, 2009, Wilson filed a petition for post-conviction relief which was denied after a two-day hearing on July 14, 2014. *Id.* at 25 (state docket entry 146000), 40 (state docket entry 298000). On August 4, 2014, Wilson appealed the denial of post-conviction relief to the Maryland Court of Special Appeals by application for leave to appeal. *Id*. at 40 (state docket entry 302000). The application for leave to appeal was denied on August 21, 2015, with the mandate issuing on November 2, 2015. *Id*. at 41 (state docket entry 312000). Wilson's motion for reconsideration, filed on September 4, 2015, was denied on October 30, 2015. *Id*. (state docket entry 316000).

### D.     Wilson's Claims in this Court

Wilson filed his petition with this Court on November 18, 2016, two years after his post-conviction petition was denied, and over one year after the denial of his application for leave to appeal the denial of post-conviction relief. *See* ECF No. 1. Accordingly, Wilson concedes that this petition is untimely, but nonetheless maintains that the late filing may be excused because he can demonstrate his actual innocence based on newly discovered evidence. *Id.* at 8. Wilson, more particularly, points to the following "newly discovered" evidence:

> 1.     The torn photograph of the Black male which Alura Brown had referenced. Wilson obtained the photograph through a 2010 Public Information Act request. ECF No. 1 at 8.

2.    The post-conviction hearing testimony by Bernard Cole, Jr. in which Cole asserts he did not identify Wilson at the time of the murder as the person who was in front of the victim's home.  ECF No. 1 at 8–9.

3.    The following Post-conviction hearing testimony of Jacqueline Stancliff:

a.  She could not identify the person running on the sidewalk, which, according to Wilson, contradicts the proffer at his plea hearing that Stancliff identified the person as a teenager.  ECF No. 1 at 9.

b.  She told the responding officer that "she heard the gunshot come from a place mid and high on her living room wall" which connected with the wall to the victim's stairway in the adjacent townhome.  ECF No. 1 at 9.

4.    The autopsy report which Wilson received in 2012 noting the downward trajectory of the bullet and that the murder weapon was not fired at close range. ECF No. 1 at 10.

5.    Styers' post-conviction testimony that the live cartridge found in the boot could not have come from a firearm discharged from the entry of the home, and that Styers found Cooke's knowledge of the murder weapon "suspicious."[5]  ECF No. 1 at 11.

6.    A February 15, 2000 incident report authored by Officer Harley which named Katrina Cooke as a shooting suspect.  Wilson obtained through a Public Information Act request in 2015.  ECF No. 1 at 11.

7.    A letter written by Katrina Cooke indicating she was "tired of being the victim's daughter" and was "tired of the victim taking things from her" obtained by Wilson in 2010 through a Public Information Act request.  ECF No. 1 at 12.

8.    A report reflecting that 14 latent fingerprints recovered from the victim's front door did not match Wilson.  Wilson obtained this information in 2005 through a Public Information Act request.  ECF No. 1 at 12.

9.    A 2012 report authored by Private Investigator Thomas Chase concurring with Styers regarding the origin of the live round found inside the boot behind the front door.  ECF No. 1 at 12–13.

Based on this "newly discovered" evidence, Wilson argues that this Court's refusal to reach

the merits of his petition would result in the continued incarceration of one who is actually innocent

---

[5] Wilson asked Styers about this suspicion, but the Court sustained objection as to its relevance.  ECF No. 17-2 at 107–08.

and constitute a miscarriage of justice. ECF No. 1 at 13. In support of his position, Wilson raises near identical arguments as those advanced in his post-conviction proceeding: constitutional ineffectiveness of trial counsel and the State's withholding of exculpatory evidence. *Id*. at 14–19. Wilson's ineffectiveness claim is based on trial counsel's failure to (1) investigate an alternative suspect defense; (2) interview Bernard Cole, Jr.; (3) file pre-trial motions to suppress and/or exclude footprint tracking evidence; (4) investigate footprint tracking evidence; (5) interview Jacqueline Stancliff; (6) interview Erica Farmer; (7) investigate ballistic evidence; (8) review and investigate the findings of the Medical Examiner; (9) investigate fingerprint evidence; and (10) "know the true facts" of Wilson's case before advising him to enter an *Alford* plea. *Id*. As to the *Brady* violation, Wilson maintains that the State never provided the photograph of a black male that three-year-old Alura Brown had used to identify the man in the house. *Id*. at 19. For the following reasons, the Court must dismiss Wilson's petition.

## II.     Standard of Review

### A.     Timeliness

Wilson's conviction became final on January 8, 2001 and he filed his petition in this Court on November 8, 2016. *See* ECF No. 1 at 7. A one-year statute of limitations applies to habeas petitions in non-capital cases for persons convicted in state court. *See* 28 U.S.C. § 2244(d)(1); *Wall v. Kholi*, 562 U.S. 545, 550 (2011). Section 2244(d)(1) provides that:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--
>
> (A)   the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B)   the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

Under both § 2244(d)(1)(A) and § 2244(d)(1)(D), Wilson's petition is untimely because it was filed in this Court more than one year after his judgment became final and more than one year after the factual predicate of his claims were discovered. Nor does a factual basis exists to find Wilson's petition timely under § 2244(d)(1)(B) and (C).

However, pursuant to § 2244(d)(2), "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2). This provision does not assist Wilson. For the one-year period between the date Wilson's conviction became final and the deadline for filing a federal habeas petition expired (January 8, 2001 to January 8, 2002), Wilson had no application for State post-conviction or other collateral review pending.[6] Accordingly, the one-year period was never tolled under the statutory provisions.[7]

---

[6] Wilson filed a post-conviction petition on February 26, 2004, which he withdrew on October 21, 2004. ECF No. 5-1 at 21–22 (docket entries 95000 and 112000). By that time, the deadline for filing a federal habeas petition had already expired.

[7] Wilson's claim is also not subject to equitable tolling. *Holland v. Florida*, 560 U.S. 631, 645 (2010); *Harris v. Hutchinson*, 209 F.3d 325, 328–30 (4th Cir. 2000). For a claim to be equitably tolled, a habeas petitioner must show: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland*, 560 U.S. at 649 (citation and internal quotation marks omitted); *see also Harris*, 209 F.3d at 330 ("[A]ny invocation of equity to relieve the strict application of a statute of limitations must be guarded and infrequent" and "reserved for those rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result."). Wilson does not advance any specific grounds to support equitable tolling.

Wilson contends that he became aware of the factual predicate for his claims through responses to Public Information Act requests in 2005 and 2010. ECF No. 1 at 8 (referencing acquisition of photograph in 2010); *id.* at 12 (referencing acquisition of letter from Katrina Cooke in 2010 and fingerprint evidence in 2005). To the extent that Wilson may claim that this "newly discovered" evidence operates to reset the one-year filing deadline under 28 U.S.C. § 2244(d)(1)(D), the claim fails. The evidence upon which Wilson relies was known to him at the time of his plea, and so cannot be considered newly discovered.

**B. Actual Innocence**

Wilson's main contention is that his demonstrated actual innocence serves as a gateway through which his untimely petition may be considered. ECF No. 1 at 8 (citing *McQuiggin v. Perkins*, 569 U.S. 383 (2013). Respondents contend that Wilson's *Alford* plea forecloses the opportunity to raise an actual innocence claim because this plea is effectively the same as a guilty plea in that Wilson admitted that the evidence is sufficient to prove his guilt beyond a reasonable doubt. ECF No. 17 ¶ 5. This Court need not reach this question because Wilson cannot demonstrate his actual innocence. *Cf. Clark v. Clarke*, 648 F. App'x 333, 339–40 (4th Cir. 2016) (remanding to the District Court for consideration of actual innocence gateway claim where Petitioner had entered an *Alford* plea).

**i.    Standard of Review**

Actual innocence is an "equitable *exception* to § 2244(d)(1), not an extension of the time statutorily prescribed." *McQuiggin*, 569 U.S. at 391 (emphasis in original). "[A] credible showing of actual innocence may allow a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief." *Id.* at 392. Thus, Wilson's Sixth Amendment claim of ineffective assistance of counsel, concededly time-barred, may be reached if

"new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" *Id*. at 395 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). In the context of an untimely petition, "[u]nexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing." *McQuiggin*, 569 at 399. "It would be bizarre to hold that a habeas petitioner who asserts a convincing claim of actual innocence may overcome the statutory time bar § 2244(d)(1)(D) erects, yet simultaneously encounter a court-fashioned diligence barrier to pursuit of [his] petition." *Id*. "This rule, or fundamental miscarriage of justice exception, is grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons." *Id*. at 392 (citation omitted).

Whether a petitioner has satisfied the miscarriage of justice exception requires the reviewing court to consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House v. Bell*, 547 U.S. 518, 538 (2006) (citation and internal quotation marks omitted). The new evidence must be evaluated with any other admissible evidence of guilt. *Wilson v. Greene*, 155 F.3d 396, 404–05 (4th Cir. 1998). To be credible, a claim of actual innocence must be based on reliable evidence not presented at trial. *Schlup*, 513 U.S. at 324. "Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." *Id.* at 316.

The United States Supreme Court has "caution[ed], however, that tenable actual-innocence gateway claims are rare: 'A petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably would have voted

to find him guilty beyond a reasonable doubt.'" *McQuiggin*, 569 U.S. at 386 (brackets omitted)

(quoting *Schlup*, 513 U.S. at 329); *see also House*, 547 U.S. at 538; *Wilson*, 155 at 404 ("Claims

of actual innocence . . . should not be granted casually.") (internal citations omitted). To sustain a

credible claim of actual innocence, a Petitioner must marshal "new reliable evidence—whether it

be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical

evidence—that was not presented at trial. Because such evidence is obviously unavailable in the

vast majority of cases, claims of actual innocence are rarely successful." *Schlup*, 513 U.S. at 324.

The gateway actual innocence "standard is demanding and permits review only in the

'extraordinary' case." *House*, 547 U.S. at 538 (citation omitted); *see also McQuiggin*, 569 U.S. at

401 ("We stress once again that the [actual innocence] standard is demanding.").[8] Where "none

of [the] evidence contradicts, or even undermines, the essential testimony of the identifying

witnesses or the State's other evidence," the standard is not met. *Hayes v. Carver*, No.17-

7441, slip op. at 8 (4th Cir. Apr. 22, 2019).

"At the same time, though, the [actual innocence] standard does not require absolute

certainty about the petitioner's guilt or innocence." *House*, 547 U.S. at 538. "Rather, the petitioner

must demonstrate that more likely than not, in light of new and reliable evidence, no reasonable

---

[8] Examples of new evidence that has satisfied the actual innocence gateway exception include: (1) DNA evidence and expert testimony "call[ing] into question" the "central forensic proof connecting [the petitioner] to the crime," as well as "substantial evidence pointing to a different suspect," *House*, 547 U.S. at 540-41 (2006); (2) "sworn statements of several eyewitnesses that [the petitioner inmate] was not involved in the crime" and affidavits "that cast doubt on whether [the petitioner inmate] could have participated" in the offense, *Schlup*, 513 U.S. at 331; (3) a third party's consistent and repeated statement that the third party committed the offense, *Jones v. McKee*, No. 08 CV 4429, 2010 WL 3522947, at *9–I0 (N.D. Ill. Sept. 2, 2010); *Carringer v. Stewart*, 132 F.3d 463, 478–79 (9th Cir. 1997) (finding that the petitioner opened the actual innocence gateway where another person testified under oath that he committed the offense and separately boasted to other individuals that he set-up the petitioner); and (4) documentary evidence indicating that the petitioner was in another country on the day of the offense and affidavits from individuals stating that the petitioner was outside the country at the precise time of the offense, *Garcia v. Portuondo*, 334 F. Supp. 2d 446, 452–56 (S.D.N.Y. 2004). *See Schlup*, 513 U.S. at 324 (providing examples of sufficient new reliable evidence for a gateway claim, including "exculpatory evidence, trustworthy eyewitness accounts, or critical physical evidence").

juror would find him guilty beyond a reasonable doubt." *Teleguz v. Zook*, 806 F.3d at 803, 809 (4th Cir. 2015) (citing *House*, 547 U.S. at 538). The actual innocence determination "requires a holistic judgment about all the evidence and its likely effect on reasonable jurors applying the reasonable-doubt standard." *House*, 547 U.S. at 539 (internal citation and quotations omitted); *see also Finch v. McKoy*, 914 F.3d 292, 299 (4th Cir. 2019).

Wilson claims that exculpatory evidence was withheld from him to induce his *Alford* plea, in violation of his Sixth Amendment right to effective assistance of counsel. Had he known about the evidence, Wilson reasons, he would have opted to go to trial and, upon consideration of the evidence outlined in his petition, he would have been exonerated. The evidence Wilson maintains supports his claim of actual innocence is reviewed below.

ii. **Analysis**

Overall, Wilson's post-conviction hearing conclusively established that he not only knew about the other evidence on which he now relies, but he also discussed it at length with counsel prior to entering his plea. ECF No. 17-4 at 4–5 (post-conviction court's observation that Wilson had no credibility based on documents in his own handwriting). Alternatively, the same evidence, even if new, does not establish his actual innocence.

Wilson first relies on Styers' ballistics opinion to support his actual innocence claim. Styers based his opinion on evidence known to Wilson and trial counsel at the time of his plea, and so any opinions derived from such evidence were obtainable at the time of trial. Even if Styers' report is new, it does not exculpate Wilson. Styers admitted that he based his conclusion as to the inaccuracy of Katrina Cooke's description on an assumption that the live round found in the boot had been expelled from the firearm at the time Gale Cooke was shot. Styers did not

consider the totality of Katrina Cooke's statement describing how Wilson had entered the foyer, walked around the room, and kicked the body of the victim.

Nor did Styers consider the testimony of other witnesses who had confirmed that Wilson earlier had been brandishing a loaded weapon, allowing a plausible inference that Wilson had live rounds on his person, and that one of which could have fallen out as he walked around inside the house. Styers' report, therefore, does not make it likely a reasonable jury would acquit Wilson. As to whether the report impugns Katrina Cooke's credibility, this Court concurs with the post-conviction court that Cooke's credibility could be attacked in many other ways, rendering cumulative any additional impeachment arising from Styers' opinion.

In this regard, Styers' opinion does not hold the same evidentiary significance as the new expert evidence proffered in *Finch v. McKoy*, 914 F.3d 292, 297–98 (4th Cir. 2019). There, the Court found that newly offered expert testimony regarding the inaccurate description of the victim's gunshot wounds as described in the autopsy report, coupled with suggestable identification line-up procedures and an eyewitness recantation, collectively supported an actual innocence claim. *Id.* at 297–302. The expert testimony in *Finch* undermined the only identification evidence offered against Finch—the identification of the weapon used to kill the victim. *Id.* at 299.

Here, Katrina Cooke had identified Wilson as the person she saw shoot her mother. Cooke also described how Wilson walked into the house, held her at gunpoint, walked around the house and kicked the victim, all of which offers a plausible explanation for how the live round ended up in the boot behind the front door. And Cooke has not recanted this testimonial evidence. Because the Styers' report does not shake the evidentiary foundation supporting Wilson's guilt, the Court cannot find that a reasonable juror would have acquitted Wilson based on Styers' opinions. *Cf.*

*Wilson*, 155 F.3d at 404 (expert testimony regarding voluntary intoxication in support of temporary insanity defense insufficient for actual innocence claim where there is "little evidence" that defendant suffered from permanent disorder that would be the basis for an affirmative defense).[9]

Wilson next relies on three-year-old Alura Brown pointing to a torn photograph of her father to indicate who had been in the house when her grandmother "fell" to support his claim. This evidence, too, is neither new or exculpatory. ECF No. 17-3 at 50–51; ECF No. 17-3 at 84–85, 113. Indeed, Sean Brown's testimony at the post-conviction hearing reinforces that he had not been anywhere near the murder that night. Brown testified at the post-conviction hearing that he lived in Havre de Grace, an area far from Charles County, he did not drive, and that he did not spend any time in Charles County when he was in a relationship with Katrina Cooke. ECF No. 17-2 at 122–28. No other evidence establishes, at all, that Brown was involved in Cooke's murder. Accordingly, this Court cannot find that a three-year-old's pointing to a photograph the night of the murder would sufficiently convince a reasonable juror that Wilson did not shoot Cooke. *See* ECF No. 17-3 at 46–50 (Capt. Gimler's testimony regarding interaction with Alura); *id.* at 59 (Capt. Gimler stating that Alura did not say "daddy was here" when her grandmother was killed).

Third, Bernard Cole's statement to police, likewise is neither new or exculpatory. Cole's statement, which was provided to trial counsel in discovery, reflects that Cole answered the question as to who was standing on the step with Katrina Cooke as follows: "Damion because who else would it be." ECF No. 17-3 at 111. Accordingly, to the extent Wilson suggests that such identification is speculative, Wilson knew this when he took the plea. Even if the evidence is new, it does not exonerate Wilson, if for no other reason than it does not shake Katrina Cooke's eye-

---

[9] Wilson also does not challenge other witness accounts demonstrating that he had recently purchased a firearm of the same caliber as the murder weapon, and that he had been seen brandishing the gun and saying that he was going to kill someone with it. ECF No. 17-4 at 30.

witness account of Wilson shooting her mother.  Nor did Cole recant his testimony, but rather clarified that he had assumed the man with Cooke that night was Wilson because Wilson was dating Cooke.  *Cf. Finch*, 914 F.3d at 297 (affidavit from identification witness stating police and prosecutor pressured him into sticking to his original story implicating defendant after he expressed doubt); *Teleguz*, 806 F.3d at 810.

Fourth, Wilson points to the Medical Examiner report, which indicates that the gunshot wound entry was in a downward trajectory and not indicative of a shot fired at close-range.  Again, Wilson had this information in advance of the *Alford* plea.  *See* ECF No. 17-3 at 153.  Nor is such evidence exculpatory.  As Wilson's attorneys acknowledged, no other evidence supported that the shot was fired at close range, such as burn marks or gunshot residue on the victim.  *See* ECF No. 17-3 at 226.  More to the point, this evidence would not have supported Wilson's main defense—that he was never there.  *Id*. at 155–58.  Nor does this evidence undermine Katrina Cooke's eyewitness account.  The report notes that the bullet followed a slight downward trajectory not inconsistent with Wilson having shot Cooke.  *Id.* 269.  Wilson, moreover, presented no evidence to the contrary at the post-conviction hearing. When taken alone or in combination with the other evidence, this Court cannot conclude that trajectory information acquits Wilson.

Fifth, Wilson relies on the police K-9 unit having tracked footprints from the front of the Cooke residence rather than the back where Jacqueline Stancliff saw a person flee.  ECF No. 1 at 14–15.  This evidence is also not new, nor does it exculpate Wilson.  While it is true that canine officers tracked footprints from the front door, the tracking led nowhere of any evidentiary value.  Perhaps the tracking itself may have been used impeach Stancliff who confirmed that she had seen someone fleeing from the back and headed toward where Wilson lived.  ECF No. 17-3 at 13, 17.  But because the tracking did not lead to anyone in particular, the Court cannot see how this

evidence would exonerate Wilson. In fact, trial counsel had conveyed to Wilson their views of its marginal relevance for this very reason. *See id*. at 174.

Relatedly, Wilson contends that the K-9 tracking evidence, in combination with Stancliff's description of the suspect fleeing and the gunshot sounds from her vantage point, would have proved Wilson's theory that someone else in the house committed the crime. ECF No. 1 at 15–16. The Court does not agree. As the post-conviction court underscored, "Ms. Stancliff did not identify [Wilson] and the credibility of Ms. Stancliff was not at issue." ECF No. 17-4 at 13. Nor can the Court credit that Stancliff's description of hearing the gunshot somehow undermines Cooke's eyewitness testimony.

Sixth, Wilson contends that the absence of his fingerprints on the door of Cooke's residence establishes he was not the perpetrator. ECF No. 1 at 18. Again, this evidence does not exonerate Wilson. Wilson knew prior to his plea that "fingerprints taken from the front door of the victim's residence" were "never matched to a known individual" including Wilson. ECF No. 17-4 at 13. To be sure, Wilson could have argued this absence of his prints supports his alibi defense. That said, fingerprint evidence in this context is elusive and of limited value. The absence of prints on a door does not prove Wilson was not there that night, just that he failed to leave his prints behind.

Wilson also places much weight on Erica Farmer's recantation of her statement that she had seen Wilson that evening in the Dash-in. ECF No. 1 at 16. At the post-conviction hearing, Farmer testified that she never talked to the police or that she knew Wilson. The post-conviction court rightly determined her testimony incredible for a variety of reasons. *See* ECF No. 17-3 at 22–26. But even if the Court accepts that no evidence exists to place Wilson at the Dash-in, it does not render Wilson actually innocent. The murder did not occur at the Dash-in, and other eyewitnesses, whose testimony remains unchallenged, corroborated that Wilson had purchased the

firearm before the murder and had threatened to shoot someone with it. *See Hayes*, No.17-7441, slip op. at 9 (witness's conflicting testimony regarding the petitioner's appearance did not meet actual innocence standard, "especially when considered in the context of all the evidence," including other eyewitnesses). Thus, the absence of evidence placing Wilson at the Dash-In does not establish his innocence.

Similarly, Wilson's assertions regarding the orange juice bottle found outside of the victim's home does not establish his actual innocence. ECF No. 19 at 4. Wilson contends that he had discarded the juice bottle earlier in the day when he had dropped off baby wipes to the Cooke residence. To the extent that the bottle was found only after the heavy snowfall had melted, corroborating Wilson's assertions he was at the Cooke's house at 4:00 p.m., it does not negate the evidence that Wilson returned later that day and shot the victim. In short, taking Wilson's point about the timing of the orange juice bottle having been discarded as true, it does not alter the Court's analysis.

Wilson lastly asserts that the evidence generated at the post-conviction hearing undermined the reliability of Katrina Cooke's eyewitness testimony. ECF No. 19 at 6. Cooke certainly maintained a contentious relationship with the victim, had a history of drug use, and gave varying accounts of her mother's murder. However, this information was known to Wilson at the time he pleaded guilty. In this respect, Cooke was believable enough to shake Wilson's confidence in proceeding to trial. *See* ECF No. 17-3 at 82, 87, 122–23, 128, 205–09, 232, 275. Wilson's reliance on a February 15, 2000 police report identifying Cooke as a shooting suspect (ECF No. 1 at 11) and a letter authored by Cooke indicating she was unhappy with her mother (*id*. at 12), therefore, does not establish that Cooke was the murderer. At the time of trial, Wilson intended to portray Cooke as the real culprit; the fact that law enforcement saw the same as a possibility does not cast

doubt on the validity of Wilson's plea. Cooke still maintains that Wilson committed the murder, and Wilson entered an *Alford* based on this and other evidence. The relative strength of Cooke's eyewitness account remains unchanged.

In sum, Wilson has failed to generate any new evidence, considered separately or in combination, that "more likely than not" demonstrates how "no reasonable juror would find him guilty beyond a reasonable doubt." *Teleguz*, 806 F.3d at 809 (citing *House*, 547 U.S. at 538). The evidence submitted to this Court is neither new nor exculpatory. It has long since been available to Wilson, and construed most favorably to him, could have been used to impeach or raise doubt in the jury's mind, but not to establish his actual innocence. For this reason, Wilson's failure to file a timely petition may not be excused under the actual innocence exception.

## III. Conclusion

Wilson has failed to establish actual innocence, which requires this Court to dismiss his untimely petition. "Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." *Schlup*, 523 U.S. at 315–17. When a district court dismisses a habeas petition solely on procedural grounds, a certificate of appealability will not issue unless the petitioner can "demonstrate both (1) 'that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right' and (2) 'that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" *Rose v. Lee,* 252 F.3d 676, 684 (4th Cir. 2001) (quoting *Slack v. McDaniel,* 529 U.S. 473, 484 (2000)). Wilson may still request that the United States Court of Appeals for the Fourth Circuit issue such a certificate. *See Lyons v. Lee*, 316 F.3d 528, 532 (4th

Cir. 2003) (considering whether to grant a certificate of appealability after the district court declined to issue one). This Court declines to issue the same.

A separate Order follows.

_____4/24/19_____                    _____/S/_____
Date                                          Paula Xinis
                                              United States District Judge